## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:04CR294JCH(MLM) |
| | ) | |
| DENNIS WAYNE HINKLE, SR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on defendant's Motion to Suppress Evidence and Statements [Doc. 18] and defendant's Post-Hearing Motion to Suppress Evidence [Doc. 41]. The government responded to the first Motion [Doc. 22]. The government filed a post-hearing brief in response to the Second Motion [Doc. 47]. Plaintiff replied [Doc. 51] and the government sur-replied [Doc. 53].

## TABLE OF CONTENTS

I.      Procedural Background

II.     Evidentiary Hearing No. 1

        A.      Findings of Fact

                1.      Eleonore Griffin
                2.      Anthony Michael Griffin
                3.      Gordon Holdiman
                4.      Don Wylde
                5.      Chris Joggerst
                6.      Donald Reynolds

        B.      Conclusions of Law

                1.      Defendant's Statements
                2.      Searches
                        a.      Voluntariness
                        b.      Authority
                                (1.)    Actual
                                (2.)    Apparent
                                (3.)    Power of Attorney

(4.)     **Individual Searches**
        i.     **1/13/03**
        ii.    **1/16/03**
        iii.   **1/20/03**
        iv.   **3/28/03**

**III.**     **Evidentiary Hearing No. 2**

    **A.**     **Findings of Fact**

    **B.**     **Conclusions of Law**

## I.     PROCEDURAL BACKGROUND

On 5/13/04 defendant was charged in a four count Indictment with three counts of being a Felon in Possession of a Firearm and one count of Possession of a Short Barrel Shotgun which was not registered. The Indictment charges nine prior felonies. On 6/1/04 defendant filed a Waiver of Speedy Trial and moved for a continuance of the deadline for filing pretrial motions and the motion hearing. On 6/15/04, the Honorable Jean C. Hamilton approved defendant's Waiver of Speedy Trial. On 6/18/04 defendant again moved for a continuance. On 6/24/04 the government filed a [First] Superceding Indictment adding a fifth count of Attempt to Destroy or Conceal a Record with the Intent to Impair its Availability for Use in an Official Proceeding. Defendant filed his Motion to Suppress Evidence and Statements and the government asked for an extension of time to respond. After the response was filed, defendant again requested a continuance of the hearing. On 7/26 and 27/04 the first Evidentiary Hearing was held. Following the hearing counsel for defendant requested and was granted leave to file a post-hearing brief. Counsel for defendant also moved to withdraw. The government opposed the motion. Following an in-camera hearing on 8/11/04 the court granted counsel's Motion to Withdraw and appointed substitute counsel. On 9/23/04 new counsel sought and was granted leave to file a post-hearing Motion to Suppress Evidence. On 9/30/04 the government filed a [Second] Superceding Indictment adding a sixth count of Attempt to Leave Custody Without Authorization. The government also sought and was granted an extension of time

to file a post-hearing brief which was then filed on 10/7/04. As noted above, the defendant replied and the government sur-replied. On 10/29/04 a second Evidentiary Hearing was held on the issues raised by the addition of the sixth count.

## II. EVIDENTIARY HEARING NO. 1

At the first Evidentiary Hearing on 7/26 and 27/04 the government presented the testimony of Eleonore Griffini, Anthony Michael Griffini, SA Gordon Holdiman (twice), Don Wylde, Lieutenant Chris Joggerst and Detective Donald Reynolds. [1] The defendant did not present evidence. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

### A. Findings of Fact

1. **Eleonore Griffini** testified that for four years she has been an administrative assistant at Great West Health Care, responsible for approximately 150 people. Her duties include payroll, human resources and assisting the managers under the vice president and the director. She met defendant Dennis Hinkle through her son, Michael, in 1989 when both defendant and her son were in the St. Louis County Jail. Her son, who was 18 at the time, believed defendant was a nice guy who wanted to meet a Christian woman and get his life straightened out. She and defendant developed a relationship and she eventually helped facilitate his release from the Jefferson County Jail by loaning him money to make bond. In approximately October, 1989 defendant moved in with Ms. Griffini at the Village Royale Apartments where she lived from 1987 to 1993.

---

[1] The court acknowledges that the story does not flow smoothly. It comes from numerous witnesses and must be pieced together. However, because credibility is an issue, it is important that each witness's testimony be set out in order to establish a basis for the assessment of truthfulness.

Ms. Griffini testified about her acquisition of two parcels of property at 6129 and 6132 Bender Lane. One parcel consists of a long, narrow piece of land separated by a dirt road from the other slightly square-shaped parcel. The main house is on 6132 (the square parcel) and the garage is on 6129 (the long parcel). Gov.Ex.1-M is the Executor's Deed dated May 1, 1992 showing the parcels were transferred to Eleonore D. Griffini. When the property was purchased defendant said he wanted to place the property in her (Ms. Griffini's) name because she had taken care of him after he was involved in an industrial accident. Much later, defendant told her he wanted to keep it out of his wife, Linda's, hands. Defendant borrowed $17,000 from William Kuntscher to purchase the property ($15,000 for the property and $2,000 for back taxes). Defendant moved onto the property in approximately August, 1993 after defendant had done extensive repairs to it. Ms. Griffini moved in shortly thereafter. During the time Ms. Griffini knew defendant (from approximately 1989 to the present) he had never had a steady job. He did work occasional construction jobs. From approximately October, 1996 through May, 1999 he was incarcerated in the Missouri Department of Corrections serving concurrent time for convictions in Missouri and Illinois. Defendant never provided financial support for the maintenance or upkeep of the property on Bender Lane. Ms. Griffini, who was employed throughout the time, paid all the utility bills including electric, water, trash, telephone and satellite or cable as well as property taxes, maintenance expenses and repair bills. Defendant would on a rare occasion give her money but said it was not his property so he did not feel he had to pay.[2]

Gov.Ex.6-M is a diagram of the main house at 6132 Bender Lane. Although defendant and Ms. Griffini at one time had an intimate relationship, they lived in the Bender Lane house as co-habitants. They had separate bedrooms and shared the other parts of the house. Ms. Griffini frequently went into defendant's room, which was not kept locked, to place his folded laundry on his

_____

[2] Later Ms. Griffini mortgaged the property for $25,000. She sold it in 2003 for $150,000. She kept the sale proceeds minus the mortgage payoff. Neither defendant nor Mr. Kuntscher received any of the money.

bed and his socks in his sock drawer.  She also entered his drawers to retrieve keys to various locks at his request.  Although defendant generally did not want anyone entering his room, he expected Ms. Griffini to go in on a regular basis and she risked his hostility if she did not handle the laundry as he demanded.

Gov.Ex.7-M is a photo of the house with a red trailer next to it.  Defendant kept his tools and ladders in the red trailer.  During the course of their relationship, Ms. Griffini and defendant discussed how he acquired various items and defendant frequently said "He got a good deal on it." By this he meant he stole it.[3]  He found this funny.  They discussed how he acquired the red trailer when he first brought it to the property after he was released from the Missouri Department of Corrections in 1999.  He told her he "got a good deal on it."  The trailer was white when he first brought it home and he placed it behind the garage where it could not be observed.  Within three days defendant painted it red.  Ms. Griffini entered the garage where the trailer was located on a regular basis to get her lawnmower.

Ms. Griffini also testified that she had a relationship with William Kuntscher who was considerably older than she.  On 2/14/02 she married Mr. Kuntscher however, she continued to reside at the Bender Lane address and Mr. Kuntscher resided at his own home.  Eventually Mr. Kuntscher filed for divorce.

On 1/13/03 Ms. Griffini was contacted by the St. Louis Police who informed her that Mr. Kuntscher was dead.  The divorce had not been finalized at that time.  The police asked her to go to the morgue and identify his body.  During the course of her conversations with the detectives, they asked her who owned the Bender Lane property and she told them she owned it.  They presented her with a consent to search form which she filled out and signed at her kitchen table.  Gov.Ex.2-M.  She

---

[3]  He also said he "found" things meaning he stole them.  Ms. Griffini testified defendant stole several trailers and other things on a regular basis such as jack hammers, heavy highway equipment, and things from Ameren UE.  When he stole trailers, he would re-paint them and re-license them.  He also stole a Trans Am or Firebird in 1993 and put another engine in it.  He actually went to prison for this crime.

testified they made no threats or promises to induce her to sign. She was not under the influence of drugs, alcohol or medication. She did not hesitate to consent to the search. As part of the search, the officers searched defendant's room. During the search, Jim Messenger arrived. Mr. Messenger volunteered to take her to the morgue and bring her home.

Ms. Griffini further testified on direct examination that on January 16, 2003 the police again requested consent to search both 6132 and 6129 Bender Lane and a gray 1984 van. Gov.Ex.3-M is the consent form she signed on that date. She testified no threats or promises were made to induce her to consent. She was not under the influence of drugs or alcohol. She said they could search any where they wanted to search. She did not hesitate or equivocate. She signed the form at Det. Kaelin's desk. She gave the police additional information about her dogs on the property and gave them defendant's keys which they had taken from defendant's property and given to her.

On 1/20/03 the police again requested to search the residence. Gov.Ex.4-M is the consent form she signed that date at her residence. She testified that again they made no threats or promises, and she was not under the influence of drugs or alcohol. Defendant's son and daughter-in-law were present during the search. Ms. Griffini was at work.

Also on 1/20/03 Jim Messenger's wife called Ms. Griffini and asked if defendant owned a certain coat which defendant had left at the Messenger's house. Ms. Griffini believed the police would want the coat so she went to obtain it. While she was there, Jim Messenger gave her a black bag that belonged to defendant. The police eventually confiscated both the bag and the coat.

Ms. Griffini used her personal computer to prepare contracts for defendant to use in his occasional jobs. At some point, Ms. Griffini gave the police a copy of a roofing contract she had prepared because the police wanted to know where defendant obtained his .223 rifle. She said defendant obtained the rifle in exchange for some roofing work he did for Rufus McCulley. Ms. Griffini gave them the copy of the contract she had on her personal computer.

Defendant was incarcerated during part of the time during which he had a relationship with Ms. Griffini. On November 4, 1997, while he was incarcerated in the Missouri Department of

Corrections, defendant executed a document entitled "General Durable Power of Attorney." It was during this period that defendant was divorcing his wife, Linda, and needed someone to "stand in his stead." Gov.Ex.24-M is the Power of Attorney which states:

### GENERAL DURABLE POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS that I, Dennis Wayne Hinkle, Sr., #52584, S.S. #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, dob 9/09/21-1948, Algoa Correctional Center, P. O. Box 538, Jefferson City, Missouri 65102, the County of Cole, being of sound mind, reposing special trust and confidence in Eleonore D. Griffini, SS #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, dob 06-27-1946, 6132 Bender Lane, Mehlville, Missouri 63128, have made, constituted and appointed, and by these presents do make, constitute and appoint the said Eleonore D. Griffini, my true and lawful durable attorney of record to exercise or perform any act, power, duty, right, or obligation whatever I have or amy [sic] acquire relating to any person, matter, transaction, or property, real or personal, tangible, now owned or hereafter acquired by me. I grant said durable attorney full power and authority to do and perform all and every act necessary in exercising any of the powers granted herein as fully as I might do if personally present, with full power of revocation, hereby ratifying and confirming all that said durable attorney shall lawfully do or cause to be done by virtue of the General Durable Power of Attorney.**

**This is a General Durable Power of Attorney and the authority of my attorney-in-fact shall not terminate if I become disabled or incapacitated, and shall be in affect [sic] until revoked by the principal in writing. (emphasis added)**

This document was executed on November 4, 1997 by the principal, Dennis W. Hinkle, Sr. It is notarized by Julie Koenigsfeld.

Ms. Griffini did not mention the Power of Attorney to the officers at any time before the searches on the 13th, 16th or 20th. She found it later in a black tub in defendant's room. He had taken it out of her file. She eventually used the Power of Attorney to sell some of defendant's things. His son and daughter-in-law took 90% of his things.

Gov.Ex.23-M is a letter written on 5/24/04 by defendant to Ms. Griffini asking her "please never mention that Power of Attorney paper. It's best not to exist but never mention it, its harmful to some, more than one." The Power of Attorney was never revoked in writing. After she received the 5/24/04 letter, she had her son contact SA Holdiman and tell him that she had the Power of Attorney. She gave the original Power of Attorney and the letter to SA Holdiman.

Ms. Griffini also testified about the threats made to her and/or her family by defendant over the years. In 1995 she left defendant and moved to her sister's residence in Colorado because she

knew she could not get away from defendant in Missouri. Defendant threatened to burn her mom and sister out of their mobile home. Because she did not want her mom and her sister harmed, Ms. Griffini came back. When defendant went to prison in 1996, she tried to sell the property and leave but defendant found out and started sending her threatening letters from prison. She contacted the Board of Probation and Parole and told them defendant was sending her death threats in the mail. Because of her report, defendant's mail was monitored. He repeatedly threatened her son in order to make her suffer and said he would kill her son in front of her.

On cross examination it was established that Ms. Griffini has received immunity in return for her cooperation and truthful testimony with respect to defendant's Federal firearms violations. She also received immunity from the State of Missouri (Circuit Attorney's Office) regarding her testimony about the murder of William Kuntscher.

Ms. Griffini was cross examined at extraordinary length about her involvement in both the murder and her consents to search. On cross, Ms. Griffini testified that she was at the police station from 10:00 a.m. on 1/15/04 and was coerced by the police into making untrue statements about the murder. They said they would lock her up if she did not agree to what they said. They would not let her sleep but kept badgering her. She made an audio statement on the 1/15 and a video-taped statement on the morning of 1/16. She did not leave until approximately 11: 15 a.m. on 1/16. She signed the consent form for the search on 1/16 after her video-taped statement while she was still at the police station.

Once again on re-direct, Ms. Griffini re-affirmed that no threats or promises were made to induce her to consent. She not only reiterated her statement but said that when she went to court for her restraining order to keep defendant away, some of the conditions were that defendant sign over any rights to the property at that time. She let him move back in because she was afraid he would fire bomb the house. She entered the garage where the trailer was located on a regular basis to get her lawnmower.

The court made inquiry of Ms. Griffini because of the confusing and sometimes apparent inconsistencies in her testimony. The following exchange took place:

THE COURT: Well, Ms. Griffini, I have to admit I'm confused. You have just told Mr. Reilly that you were not coerced, threatened or anything in anyway at any time to sign these consents.

THE WITNESS: That's correct.

THE COURT: You've just told Mr. Dwyer Detective Kaelin was coercing you. Which is it?

THE WITNESS: Well, he didn't coerce me to sign the forms because I wanted the truth to come out just as much as they did. What they coerced me in is to lie about what actually happened. And they wanted me to be a part of the murder so that I would be a sealed and delivered witness. And that was a lie, that part.

THE COURT: Alright. Thank you. You may step down. ...

2. **Anthony Michael Griffini ("Michael")** testified he has been convicted of Attempted Robbery in the First Degree, Tampering in the First Degree, Escape from Custody, Stealing a Motor Vehicle, perhaps more than one count of Stealing a Motor Vehicle, Burglary in the First Degree, Burglary in the Second Degree and a Stealing misdemeanor. For these he received sentences ranging from one year in the County jail up to seven years in the Missouri Department of Corrections. In addition, he has a conviction for Perjury in the State of California for which he was sentenced to eight years. He affirmed that he introduced his mother to defendant in 1989 when he and defendant were both in the county jail and the defendant became a part of Ms. Griffini's and his life thereafter. He was shown Gov.Ex.7-M and 15-M, photos of defendant's red trailer. He spoke to defendant about this trailer when he came to visit his mother. Defendant said he had picked up at a construction site the white trailer parked behind the garage. Defendant said it is amazing what you can find when everybody goes out to lunch at a construction site. Michael Griffini testified that defendant stole the trailer. Later he observed that defendant painted it red, probably with a paint brush. When they were in jail defendant told Michael Griffini about stealing tools and other items from construction sites by

driving around to different sites and just putting them in the back of his truck. Defendant though it was funny. Defendant also told Michael that he (defendant) was "the best" at re-numbering and re-licensing stolen vehicles. He would take all the VIN's off and replace them. He had all the necessary tools for it.

3.     **Special Agent Gordon Holdiman** of the Bureau of Alcohol, Tobacco and Firearms ("ATF") for thirty-three years testified that he investigated the origin of the red trailer shown in Gov.Ex.7-M and 15-M. He contacted the Missouri Department of Revenue, the Driver and Vehicle Services Bureau and obtained certified records related to defendant's possession of trailers or registration of trailers. Gov.Ex.22-M and 22a-M are certified copies of these records. They concern the issuance of DRX numbers on trailers certified "homemade" by Don Wylde of Crystal Auto. REA589 is the license that was issued to the red(formerly white) trailer.

SA Holdiman also investigated defendant's prior criminal convictions among which was a conviction for Witness Tampering. Gov.Ex.28-M is a certified copy of this conviction. It indicates defendant threatened to kill William W. Page to induce him to be absent as a witness and withhold testimony in an official proceeding. In addition, the police report concerning the murder of William Kuntscher states that defendant made statements that Mr. Kuntscher would never show up for the court date on January 14, 2003 [there was a court date concerning his divorce from Ms. Griffini scheduled on that date]. Also in connection with reviewing defendant's criminal history, SA Holdiman learned defendant had nine or ten felony convictions and had also been arrested for other extremely serious events, one involving a murder with a blunt object. These factors were also considered in requesting the defendant's mail be monitored.

SA Holdiman also learned defendant had threatened Ms. Griffini and her son and their concerns were not negated by defendant's being incarcerated. Therefore, SA Holdiman spoke to Lt. Joggerst at the Ste. Genevieve County Sheriff's Department about monitoring defendant's non-legal mail. Gov.Ex.27-M is correspondence to Ms. Griffini from defendant dated May 24, 2004. Prior to SA Holdiman's taking any action with regard to this letter, Michael Griffini contacted SA Holdiman

about Ms. Griffini's Power of Attorney and stated that he wanted to discuss it and turn the originals over to SA Holdiman. SA Holdiman responded to the residence and Ms. Griffini turned over the original Durable Power of Attorney and the letter to him. They were turned over entirely independently of the efforts to monitor defendant's mail. Neither Ms. Griffini nor her son knew defendant's mail was being monitored. SA Holdiman did not request or encourage them to turn over defendant's correspondence, they turned it and the Power of Attorney over entirely on their own.

4.      **Don Wylde** is a mechanic who owns his own business, Don's Car Care in Crystal City, Missouri. He first met defendant when was defendant was a customer at a Sunoco Station owned by Mr. Wylde. When Mr. Wylde moved his location, he stayed in contact with defendant and defendant helped him at another shop he owned, Don's Muffler and Auto Shop on Key West in Arnold, Missouri. Mr. Wylde is licensed by the State of Missouri to inspect cars, trailers and motorcycles. When inspecting a homemade trailer, the inspector is supposed to look at the trailer and determine if it has been homemade and verify it. The owner then takes the certification paper to the license bureau which issues a title and a tag, which is similar to a VIN, called a DRX number. Gov.Ex.22-M is a trailer verification certification (inspection approval notice) completed by Mr. Wylde on 2/10 or 2/16/01 (it is not legible) for a trailer owned by defendant at 6129 Bender Lane. It indicates "homemade" in Mr. Wylde's handwriting. There is also an application for Missouri Title and license submitted by defendant and the license ultimately issued was REA589. The witness was shown Gov.Ex.7-M , 15-M and 29-M, all photos of a red trailer. The witness did not ever recall seeing that trailer before but said it appeared to be a manufactured trailer, that is, factory made. He recalled defendant bringing him a small black trailer with steel sides. He recalled certifying another homemade trailer for defendant (Gov.Ex.22A-M) but again reiterated that the one in the photo appeared not to be homemade.

5.      **Chris Joggerst** is a Lieutenant who serves as the Jail Administrator of the Ste. Genevieve County Jail. Defendant was received in the Ste. Genevieve County Jail on May 20, 2004. Shortly thereafter, Lt. Joggerst spoke to SA Holdiman who requested that he monitor defendant's outgoing

and incoming non-legal mail. He was to make copies and send them to SA Holdiman. He was able to monitor defendant's telephone conversations pursuant to the jail's monitoring system. Gov.Ex.27-M is un-postmarked copy of a letter made by Lt. Joggerst and sent to SA Holdiman. It is an exact copy of the 5/24/03 letter from defendant to Ms. Griffini turned over to the officers by Ms. Griffini. Inmates are told that their incoming mail may be copied. They are not told that their outgoing mail may be copied.

6. **Donald Reynolds** is a Detective with the St. Louis Metropolitan Police Department ("SLMPD") assigned to the Homicide Division. On 1/13/04 at approximately 2:45 P.M. he and his partner, Detective Tim Kaelin,[4] responded to 5526 Rhodes for a homicide investigation. When they arrived they spoke briefly with the initial responding officers who indicated they had responded to a call to check on the well-being of the occupant at that address. They entered and observed the deceased victim in the bathroom, bent over the bathtub. It was obvious he had suffered blunt trauma to his forehead. The victim was later determined to be William Kuntscher. They video taped the crime scene and eventually became aware that defendant was the person who had called the police. When they arrived, defendant was standing out in front of the house on the sidewalk. Eventually he was asked to accompany other detectives back to the Homicide Office. However, defendant was not under arrest at that time. Defendant responded to the police station and spoke to Detectives Neske and Clayborne-Muldrow. Detectives Reynolds and Kaelin drove him back to his vehicle around 10:00 p.m. that evening. His vehicle was parked behind the victim's house in the alley. When the detectives dropped him off they said they would like to talk to him further so he came back on his own on 1/14 and spoke to Det. Kaelin. He left at the conclusion of that interview.

After concluding the scene investigation, Det. Reynolds determined that Eleonore Griffini was the next of kin. He learned she resided at 6132 Bender Lane as did defendant. The detectives found the living arrangements somewhat unusual because Mr. Kuntscher was 76, Ms. Griffini was

---

[4]    Also present was an intern from the Central Patrol Division, Detective Andrew Griffin and their supervisor, Sergeant Anthony Rask.

substantially younger and she lived on Bender Lane with another man, specifically defendant, who had found the victim's body. Det. Reynolds contacted Ms. Griffini on the evening of 1/13/03 and responded to her residence. When the officers arrived, she was the only person there. They identified themselves, told them they had found Mr. Kuntscher apparently murdered and they would need her to come to the morgue to identify his remains.

Knowing the strange living arrangements they asked Ms. Griffini if she resided on Bender Lane. She indicated she did and said she owned the property. She said Mr. Kuntscher owned his house on Rhodes. She said defendant lived at the Bender Lane address with her. Det. Rhodes presented her with a consent to search form used by the SLMPD. Because Ms. Griffini owned the property they asked her if she would allow them to search the property looking for any type of evidence because of the possibility that defendant might be a suspect in the incident. She expressed no surprise when she learned defendant was a suspect. She was sitting at her kitchen table. Det. Reynolds asked her to sign her name at the top and then he filled in the detectives names and she filled in the rest of the form. He read to her the portion of the form that says: "I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form." Gov.Ex.2-M. Ms. Griffini did not appear to be under the influence of alcohol or drugs; her responses to Det. Reynold's questions were appropriate. He made no threats or promises to her at any time to induce her sign the form; she was clearly not in custody. The detectives had been in her residence approximately 10-15 minutes before they asked her to sign the form. [5] Ms. Griffini did not equivocate or hesitate at any time nor did she express any reservations about searching any portion of the residence including defendant's bedroom. Prior to initiating the search, they asked if there were any weapons in the house for officer safety. She indicated defendant owned a .22 rifle and what she referred to as an assault rifle with a scope. As Det. Reynold approached defendant's bedroom he noted the bedroom door was open. As

_____

[5] Ms. Griffini put the date and time on the form. She mis-stated the date as 1/13/02 instead of 1/13/03.

he entered the room he saw in plain view two boxes of .223 ammunition. Because he had located ammunition, he believed there might be a weapon nearby. He was unable to locate a weapon so he left the bedroom and returned to the kitchen where Det. Kaelin was still talking to Ms. Griffini. A man named James Messenger had arrived. Knowing that .223 ammunition does not work in a .22 rifle Det. Reynolds asked Ms. Griffini where the weapon might be. She did not respond but Mr. Messenger interrupted and said that he had the weapons that defendant had given him to hold. The detective asked where they were and Mr. Messenger said he didn't need to tell where they were located.

Ms. Griffini rode with Mr. Messenger to the morgue and identified the body of the victim as William Kuntscher.

On the morning of 1/16/03 Det. Reynolds learned that Ms. Griffini had spent the previous night at the police station and gave statements to Det. Kaelin. The statements made by Ms. Griffini implicated defendant in the murder of William Kuntscher. Because she gave these statements to Detectives Kaelin and Griffin she was afraid to return to the home on Bender Lane because she feared defendant who was not in custody during the period of the afternoon or evening of the 15th or the morning of the 16th.

Sgt. Rask filled Det. Reynolds in on the various statements defendant had made to Ms. Griffini and based on his statements and the surrounding facts and circumstances of the case, a decision was made to arrest defendant. During the period Ms. Griffini was at the police department on 1/15-16, defendant was actively engaged in trying to contact the Homicide Office in order to learn whether Ms. Griffini was available to be picked up. At approximately 10:00 a.m. on 1/16/03 defendant called again and spoke to Det. Reynolds. Defendant wanted to know if Ms. Griffini was free to leave and Det. Reynolds said that she could go. Defendant indicated that he would be down to pick her up in a little while. The intention was to arrest defendant when he arrived.

Defendant arrived at approximately 11:00 a.m. and was placed in an interview room. Det. Reynolds contacted him shortly thereafter and told him he was under arrest for Murder, Burglary and

Armed Criminal Action.  He advised him of his <u>Miranda</u> rights by reading from his department issued card.  He read:

> You have the right to remain silent.  Anything you say can and will be used against you in court.  You have the right to have an attorney and to have him present while you are being questioned.  If you can't afford an attorney, one will be appointed for you before any questioning if you so desire.

He indicated that he understood his rights and was not willing to make any statements at that time. During booking he gave his address as 6132 Bender Lane.  As part of the booking process, his personal property was seized.  As part of this process, while still in the interview room, Det. Reynolds seized his shoe laces, wallet, etc.  Defendant said that if he was going to be arrested and charged "Eleonore would need his keys."  He essentially asked Det. Reynolds to give his keys to Ms. Griffini.  It was a large key ring with approximately 12-14 keys on it.

Det. Reynolds gave defendant's keys to Ms. Griffini while they were sitting at Det. Reynolds' desk having a cup of coffee.  She did not appear to be upset or frightened during the course of the conversation.  Det. Reynolds had learned from Sgt. Rask that Ms. Griffini had provided information about defendant having used a black gym bag and a gray Ford van as transportation when he committed the murder.  He asked her if she was willing to let the detectives go to her house to look at the van and see if they could find the black gym bag.  She had implied the murder weapon was probably still in the gym bag.  They believed it to be a hatchet or an ax or something of that nature. During the course of this conversation, Ms. Griffini said there was no problem with searching and that the detectives could go wherever they wanted and look wherever they wanted.  She actually said she had no problem allowing Det. Reynolds to search anywhere he wanted to search.  During the conversation, Ms. Griffini gave Det. Reynolds some information about the dogs that were at the property.  Apparently each of the dogs responded to a separate command.  She explained which dogs and which commands he would have to give to allow him to come into the house.  She also explained that several of the locks were in disrepair so she explained how to stick the key in, jiggle it a bit and then turn it in order to make the keys work on the locks.  She volunteered this information.  She did

not seem upset or distraught. She also told him where in the house to find extra keys to get into whatever he needed to get into. She had already been given defendant's keys and she provided defendant's keys back to the detectives to use when they went to the residence.

Det. Reynolds presented Ms. Griffini with a Consent to Search form used by the police department. Gov.Ex.3-M. She consented to the search of a gray '84 Ford van as well as the residence at 6132 and 6129 Bender Lane. She signed the form as did Det. Reynolds. She did not appear under the influence of alcohol or controlled substances. No threats or promises were made to induce her to consent. She appeared to understand Det. Reynold's questions and as a matter of fact gave instructions with regard to the dogs and the keys. This form contains the same language as Gov.Ex.2-M, to wit:

> I understand I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

Det. Reynolds responded to the Bender Lane property with Sgt. Kowalczyck and an ETU officer. When they arrived, the gray van was not there. However, they were able to see a gray van parked up the road at a neighbor's house. They eventually requested that the vehicle be towed. On the property, they located a red trailer and entered it by using the keys given to them by defendant and Ms. Griffini. The trailer had a label on it that had been painted over. They scraped the paint off and revealed a Doolittle Trailer Manufacturer's sticker. There were markings on the sticker for the VIN but there were no numbers for the VIN located there. Nor were there any other numbers such as DRX numbers. After looking for the VIN they entered the trailer. The first things Det. Reynolds noticed when he entered the trailer were tools and ladders and a crowbar. The crowbar was significant because there was evidence at the scene of the homicide of pry marks on a door. The crowbar was located next to a black gym bag with blue jean pants on top of it. In the bag were located several boxes of ammunition and a .16 gauge sawed off shotgun with the serial number removed. There were also pieces of paper and a weapon known as a "slapper". The papers included the title for

the gray Ford van in the name of Dennis Hinkle and some receipts from Best-Shot Shooting Systems and some ammunition. The receipts were for 9mm ammunition in the name of Jim Messenger. The ammunition included several boxes of 9mm shells and several loose Lawson .22 caliber shotgun shells or cartridges. There was also some Winchester ammunition some of which was Best-Shot Shooting Supply ammunition.

After Det. Reynolds examined the gym bag, he accidently hit his head on a rifle case. Located in the rifle case was a Sturm Ruger .223 caliber firearm with a scope and four magazines loaded with 30 rounds of ammunition. All the items were photographed and seized by the ETU officer.

He eventually contacted the Doolittle Manufacturing Company who indicated that the trailer did not have the original paint job. The government introduced numerous photographs of the trailer showing that the trailer had originally been white and was painted red with what appeared to be a paint brush showing white streaks through the paint. Det. Reynolds was shown Gov.Ex.22-M, particularly an application for title and license pertaining to License No. REA589 which was the license affixed to the trailer when Det. Reynolds searched it on 1/16/03. It was issued to defendant.

On 1/20/03 Det. Reynolds responded for a third time to 6132 Bender Lane. When the detectives arrived at the residence, Ms. Griffini was pulling into the driveway. She stopped to retrieve mail from her mailbox and then parked under the carport. Because Ms. Griffini had told the detectives that defendant owned a rifle with a scope and because they had seized the .223 rifle, they wanted to show it to her to see if that was the rifle to which she was referring. In addition, she had told Det. Kaelin that defendant had a shotgun but that he had buried it and had forgotten where he had buried it. They wanted to show her the sawed off shotgun that they had located to see if that was the same gun.

They displayed the weapons to Ms. Griffini. She indicated that the .223 rifle was the one that defendant received for doing the roofing job for Mr. McCulley and that the shotgun was the one defendant had told her he had buried but could not find. She verified the weapons belonged to defendant. Ms. Griffini said she had just come from Jim Messenger's house because Messenger asked

her to come over to his house to pick up some of defendant's property which defendant had asked him to keep. Ms. Griffini retrieved from the trunk of her car a small 1'x1' file cabinet and a black nylon gym bag. Det. Reynolds presented Ms. Griffini with another Consent to Search form. Gov.Ex.4-M. This form is exactly the same as the other two she had signed (Gov.Ex.2-M and 3-M). On 1/20/03 she did not appear to be intoxicated or under the influence of alcohol or drugs. No threats or promises were made to induce her to sign the consent. She appeared to understand Det. Reynolds. She signed the form as did Det. Reynolds and Kaelin. The bag contained various types of ammunition including .22 caliber, 7.62 caliber and 30/30 caliber cartridges, .410 shotgun shells and .38 caliber cartridges as well as other miscellaneous material. After looking through the file cabinet, they determined that it contained nothing of evidentiary value. Because the .223 caliber rifle was received in return for a roofing job performed by defendant, Ms Griffini printed from her personal computer a copy of a contract that had Mr. McCulley's name on it. Ms. Griffini volunteered the information that she had retrieved the items from Jim Messenger's house. These items were not solicited in any way by the detectives.

In addition to the gym bag and the file cabinet, Ms. Griffini permitted the officers to search other portions of the property. She directed them to an unused bedroom in the residence and indicated that defendant had taped weapons underneath the drawers in the dresser. They looked there but found nothing. They asked where else he might have been keeping guns and Ms. Griffin said "in the trailer." She had keys that she used to unlock the trailer for the officers and they took a second look into the trailer. They located nothing of evidentiary value. While they were looking in the trailer, Ms. Griffini blurted out "the dishwasher" and returned to the house. In an unfinished storage room was a dishwasher still in the box. They looked in the dishwasher but discovered no guns. However, right next to it rolled up in a piece of carpet they located a pistol, a .380 Super Titan.

On 3/28/03 Ms. Griffini again consented to a search. Throughout the course of the investigation, various individuals told the detectives that defendant had buried firearms at various locations on the property. They went back with the intention of using a metal detector to check the

property for firearms.  Again, Ms. Griffini signed the Consent to Search form.  Gov.Ex.5-M.  No

threats or promises were made to her to induce her to sign.  No firearms were located.


## B.    Conclusions of Law

### 1.    Defendant's Statements[6]

Defendant spoke to the police on numerous occasions.  These occasions can roughly be

divided into three categories:  at the scene and at headquarters on 1/13/03; at headquarters on 1/14

and 15/03; and after defendant's arrest on 1/16/03.

### a.    At the Scene and Headquarters on 1/13/03

There was little if any evidence presented at the Evidentiary Hearing about defendant's

statements at the scene of the murder of William Kuntscher.  Det. Reynolds merely testified that

police officers arrived at 5526 Rhodes to check on the occupant's well being.  He said he was aware

defendant had summoned the police and he observed defendant just standing on the sidewalk.  Any

statements made by defendant to the initial police responders at that time were not subject to

Miranda because clearly he was not in custody.  Both custody and interrogation are necessary before

Miranda applies.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); Rhode Island v. Innis, 446 U.S. 291,

300-01 (1980).

Apparently defendant also spoke to Det. Kaelin at the scene.[7]  Again, he was not in custody,

---

[6]    Defendant's First Motion to Suppress includes a request to suppress his statements.
[Doc. 18]  However, in the post-hearing briefs [Doc. 41 and 51], the statements are not mentioned
or challenged.

[7]    Although no testimony was adduced at the Evidentiary Hearing, the government's
response to defendant's Motion to Suppress Evidence and Statements [Doc. 22]  states:

Det. Timothy Kaelin...contacted defendant at the crime scene.  Defendant made
various statements to Det. Kaelin.  Defendant made various statements explaining
his attempts to contact Mr. Kuntscher.  Defendant advised that he arrived at Mr.
Kuntscher's residence at approximately 2:00 PM, looked in the front and back
windows and noticed the residence was in disarray.  Defendant explained that when
he failed to receive any response from the victim, he asked to use a neighbor's phone
to call the police.

so no <u>Miranda</u> rights were necessary.  Defendant agreed to accompany officers to headquarters for further questioning.  Again, no evidence was adduced, however, defendant's Motion [Doc. 18] alleges he was informed he was a suspect, hair and buccal samples were taken, he was photographed and his shoes were seized.  The government's response indicates he was advised of his <u>Miranda</u> rights, said he understood them, said he had nothing to do with Mr. Kuntscher's death and would cooperate with the detectives.  He made some oral statements and then was released.  Whether he was in custody during this four to five hour period is open for question, however, without evidence, the court cannot be expected to rely on mere allegations in briefs.  In defendant's post-hearing brief he does not challenge any of his statements - - he only challenges the searches.  Therefore, the court offers no opinion about the statements made by defendant at police headquarters on 1/13/03.

On both 1/14/03 and again on 1/15/03 defendant was requested to return to police headquarters and he did so for brief periods.  He was released immediately after speaking to detectives.  No evidence was adduced about these interviews.  The government's first response [Doc. 22] addresses the interview on 1/14/03.[8]  Defendant's post-hearing brief does not challenge these

_____

Defendant advised that the victim's wife, Ms. Griffini, did not reside with the victim, but instead resided with defendant at 6132 Bender Lane.  Defendant also stated Mr. Kuntscher and Ms. Griffini had been married for about one year.  In explaining the unusual living arrangement, defendant stated he and Ms. Griffini were merely long time friends.  Defendant stated recent visible injuries to his nose and forehead were the result of falling in his garage.  ...

[8]    The government's response states:

Defendant, while maintaining his innocence, began to make numerous oral statements about the events surrounding the murder of Mr. Kuntscher and the background of many of the persons associated with Mr. Kuntscher and defendant.  Defendant also provided details relative to the purchase of the Bender Lane property.  Defendant explained that Mr. Kuntscher agreed to loan him the money necessary to purchase said property.  Defendant also explained that he told his attorney he wanted the property in Ms. Griffini's name because he felt he would eventually end up back in prison.  Defendant explained that sometime around 1995, Mr. Kuntscher eventually filed a judgment against him for defaulting on the loan at which time defendant filed for bankruptcy.  Defendant made numerous other statements related to the investigation of the murder of Mr. Kuntscher and concluded that he did not need "Bill's" money because he could steal any vehicle he

- 20 -

statements. However, as above, the court offers no opinion about statements made by defendant at police headquarters on 1/14/03. The same is true of any statements made on 1/15/03.

On 1/16/03 defendant called police headquarters numerous times to find out when he could pick up Ms. Griffini. Det. Reynolds told him to come and get her and defendant responded to headquarters. He was taken to an interview room, told he was under arrest and Det. Reynolds immediately advised him of his <u>Miranda</u> rights by reading from the department issued card as more fully set out in the findings of fact above. Defendant declined to make a statement.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. <u>Miranda v. Arizona</u>, 384 U.S. 436, 479. When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the <u>Miranda</u> rights by the defendant. <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986). "The requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness inquiry" <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000). The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. <u>Haynes v. Washington</u>, 373 U.S. 503 (1963); <u>Colorado v. Connelly,</u> 479 U.S. at 170. However, as the Supreme Court stated in <u>Berkemer v. McCarthy</u>, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare." <u>Id.</u> at 433 n. 20; <u>Dickerson</u>, 530 U.S. at 444. Here, having been fully advised of his <u>Miranda</u>

---

wanted anytime he wanted and not get caught. Defendant declined to make a taped statement.

rights and indicating that he understood them, defendant declined to make a statement. There is nothing to suppress.

2.    **Searches**

Ms. Griffini consented to the search of the property at 1629 and 1632 Bender Lane on four occasions: 1/13, 1/16/, 1/20 and 3/28/03. Each time she signed a SLMPD Consent to Search form (Gov.Ex.2-M, 3-M, 4-M and 5-M).

A search based on the consent of an individual may be undertaken by government actors without a warrant or probable cause and any evidence discovered during the search may be seized and admitted at trial. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973). Consent must be freely and voluntarily given. <u>Id.</u> In determining whether consent is freely and voluntarily given, the court must examine the totality of the circumstances. <u>United States v. Mendenhall</u>, 446 U.S. 544, 547 (1980); <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990); <u>United States v. Lee</u>, 886 F.2d 998, 1000 (8th Cir. 1989), <u>cert. denied</u>, 495 U.S. 906 (1990).

a.    **Voluntariness**

An initial inquiry seems to be whether her consents were voluntary. It is not at all clear that defendant has standing[9] to challenge voluntariness of the consent of another person. However, for purposes of this report only and assuming without deciding that he does have standing, the court finds that Ms. Griffini's consents were voluntary. There is really no question about the 1/13, 1/20 and 3/28 consents. She was in her own house, there were no more than two or three police officers

---

[9]    As pointed out in <u>United States v. Sanchez</u>, 943 F.2d 110, 113 n.1 (1st Cir. 1991), the use of the word "standing" is convenient but somewhat imprecise. The Supreme Court has indicated in <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978), that matters of standing in the context of searches and seizures actually involve substantive Fourth Amendment law. <u>See also</u> <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998). Standing is not to be analyzed apart from the merits, rather a defendant is required to prove a legitimate expectation of privacy as a prerequisite to challenge unlawful police conduct. <u>Sanchez</u>, 943 F.2d at 113 n.1.

present. The evidence from both Ms. Griffini and Det. Reynolds is uncontroverted that no threats or promises were made to induce her to consent. She was not under the influence of alcohol or drugs and she understood the questions of the detectives. She did not hesitate or equivocate.

The only consent about which voluntariness is an issue is the one on 1/16 which she signed at police headquarters after she had been there overnight. Because the evidence seemed contradictory, the court made specific inquiry of Ms. Griffini as more full set out on pages 9 of this Report and Recommendation. The court finds that based thereon, the consent on 1/16/03 was voluntary.

b.      Authority

The issue most emphatically raised by defendant is whether Ms. Griffini had authority to consent. He asserts she had neither actual nor apparent authority. Defendant's argument are without merit. The court finds three bases upon which to conclude Ms. Griffini had authority to consent to the searches: actual, and apparent authority and the Power of Attorney. In addition, the court finds the defendant does not have standing to challenge the search of the red trailer because it was stolen. The court will consider each of the basis of authority and then analyze each of the four searches separately.

(1.)      Actual Authority

Ms. Griffini had actual authority to consent to the searches. Clearly Ms. Griffini had sole legal ownership of the house and surrounding property at 6129 and 6132 Bender Lane. Gov.Ex.1-M. It is of no significance that defendant facilitated the purchase of the property by borrowing money from Mr. Kuntscher. The deed to the properties is in Ms. Griffini's name only. Defendant's initial explanation was that he owed much to Ms. Griffini for Ms. Griffini's taking care of him when he was injured. Defendant had no steady employment and Ms. Griffini maintained full time employment. As a result, defendant did not provide any financial support for the upkeep, bills or maintenance of the property. Ms. Griffini paid all the taxes and utilities - - electric, water, trash, telephone and cable or satellite. Although defendant provided money to pay a bill on rare occasions, he said it was not his

property so he did not feel that he had to pay.  Defendant gave Ms. Griffini access to his bedroom on a regular basis to put his folded laundry on his bed and retrieve the keys from his drawers.  She risked his hostility if she did not put the laundry down correctly.  In addition, she had full and complete access to the rest of the house.

Consent to search may be given by the criminal suspect or by some other person who has common authority over or other significant relationship to the premises or effects sought to be inspected.  <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974); <u>United States v. Adams</u>, 346 F.3d 1165, 1170-71 (8th Cir. 2003); <u>United States v. Czeck</u>, 105 F.3d 1235, 1239 (8th Cir. 1997); <u>United States v. Bradley</u>, 869 F.2d 417, 419 (8th Cir. 1989).  "Common authority is a function of mutual use, joint access and control."  <u>United States v. Janis</u>, 387 F.3d 682, 686 (8th Cir. 2004) <u>quoting</u> <u>United States v. James</u>, 353 F.3d 606, 613 (8th Cir. 2003) "[A]n adult co-occupant of a residence may consent to a search."  <u>United States v. Jones</u>, 193 F.3d 948, 950 (8th Cir. 1999).  Not only was Ms. Griffini owner of the property and financially responsible for the property but defendant generally left his door unlocked and open and expected Ms. Griffini to enter his bedroom on a regular basis.  It is reasonable that as an owner and co-habitant, Ms. Griffini had the right to permit the search in her own right and that defendant assumed the risk that she might permit the residence, including his bedroom, to be searched.  <u>Matlock</u>, 415 U.S. at 171 n.7.

No valid argument can be raised that Ms. Griffini did not have actual authority to consent to a search of her residence and her property on Bender Lane.

(2.)    Apparent Authority

Ms. Griffini had apparent authority to consent as well.  A search may be valid when based on the consent of a party whom the police reasonably believe to have authority to consent to the search even if it is later determined that the party did not in fact have such authority.  <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 185-186 (1990).

"The rule for law enforcement officers' reliance on a consenting party's apparent authority 'is not that they always be correct but that they always be reasonable.'"  <u>United States v. Janis</u>, 387

F.3d 682, 686 (8th Cir. 2004) <u>quoting</u> <u>United States v. James</u>, 353 F.3d 606, 613 (8th Cir. 2003).  If the police, at the time of entry, reasonably believe a third party possesses common authority over the premises and consents, a warrantless search is valid.  <u>Janis</u>, 387 F.3d at 686.  If the facts available would have justified a reasonable officer in the belief that the consent party had authority over the premises, a third party consent is valid.  <u>United States v. Adams</u>, 346 F.3d 1165, 1170 (8th Cir. 2003).  Here, Ms. Griffini told Det. Reynolds she was the legal owner of the property and he had no reason to doubt it; Ms. Griffini lived with the defendant at least as a co-habitant at the property; she told the officers they could look anywhere they wanted, she never hesitated or equivocated either before or after signing the consents; defendant, while in the process of surrendering his property at arrest told Det. Reynolds that Ms. Griffini would need his keys if he was to be arrested and turned over the keys for Det. Reynolds to give to Ms. Griffini, clearly creating the impression that they had common access to the items for which the keys were used; Ms. Griffini gave specific information regarding her dogs and the use of the keys to facilitate the officers' search.  It is clearly reasonable for the detectives to have believed Ms. Griffini had common authority over the residence and property, including the trailer.

### (3.) Power of Attorney

Ms. Griffini also had authority based on the Power of Attorney.  As set out in full above, on November 4, 1997 while incarcerated in the Missouri Department of Corrections, defendant signed and had notarized a document entitled "General Durable Power of Attorney."  This authorized Ms. Griffini to exercise or perform any act, power, duty, right or obligation of defendant.  To whatever extent defendant claims he could have consented or not consented to a search of his bedroom, the residence, the trailer and any personal property on Bender Lane, Ms. Griffini was legally qualified to act in his stead.  Clearly the plain language of the document establishes a general durable power of attorney as contemplated by R.S.Mo. § 404.710 *et seq.*  The power is not limited to any particular function but includes all acts, powers, duties and rights.  Gov.Ex.24-M.  <u>See</u> R.S.Mo. § 404.710(7).  Although defendant removed the paper from Ms. Griffini's files and placed it with his own documents,

the power was never revoked in writing as required by the terms of the document. It remained in full force and effect. In addition, defendant's own actions and statements showed he believed the document remained binding when he wrote to Ms. Griffini on 5/24/04 and asked her never to mention the Power of Attorney.

Defendant argues that R.S.Mo. 404.710(5) requires an attorney-in-fact to act in a principal's best interest and references §§ 404.712 and .714. Section .714(10) states that "If an attorney-in-fact has a property or contract interest in the subject of the Power of Attorney...this section does not impose any duties on the attorney-in-fact that would conflict or be inconsistent with that interest." Here, defendant's personal property and the stolen trailer were on Ms. Griffini's property. His bedroom was in her residence on the property. Her obligations as defendant's attorney-in-fact do not require her to act inconsistently with her own best interests of cooperation with the police.

Ms. Griffini clearly had legal authority by virtue of the General Durable Power of Attorney and as defendant's attorney-in-fact to consent to the searches.

### (4.)  The Individual Searches

i.  1/13/03

On 1/13/03 Detectives Reynolds, Kaelin and Griffin responded to Ms. Griffini's residence on Bender Lane to inform her of her husband's death and to request that she accompany them to the morgue to identify his body. Ms. Griffini told them that she and defendant (who had reported the murder) lived together at the residence and that she was the legal owner of the property. She said she and defendant had previously been in an intimate relationship but now merely resided under the same roof in separate bedrooms. Because of the unusual living arrangements, that is, the victim's wife living with the person who reported the crime, the detectives asked if they could search defendant's bedroom. As fully set out above, Ms. Griffini voluntarily signed the consent form. Gov.Ex.2-M. Before they searched, for their own safety, they asked if defendant had any guns and Ms. Griffini said that he had a .22 rifle and an assault rifle with a scope. Det. Reynolds walked into defendant's bedroom and observed in plain view on a shelf two boxes of .223 ammunition.

When police officers are lawfully in a particular location and observe items in plain view which they have probable cause to believe are contraband or evidence of a crime, they may seize such items without a warrant. <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 464-73 (1971); <u>Arizona v. Hicks</u>, 480 U.S. 321, 326 (1987); <u>United States v. Garner</u>, 907 F.2d 60, 62 (8th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1068 (1991). There is no requirement that the discovery be inadvertent. <u>Horton v. California</u>, 496 U.S. 128, 136-143, 110 S.Ct. 2301, 2308-11 (1990). Here, Det. Reynolds was lawfully in defendant's room as a result of Ms. Griffini's voluntary consent. There was no violation of the Fourth Amendment and the ammunition should not be suppressed.

ii.     1/16/03

On 1/16/03 Ms. Griffini signed, at police headquarters, another consent to search the premises and a gray van. Gov.Ex.3-M. As noted above, this consent was voluntary. After she consented, in order to facilitate the search, Ms. Griffini told Det. Reynolds about the behavior of her dogs and which commands they obeyed. She also told him how to jiggle certain keys in order to facilitate entry into various parts of the premises.

Defendant was arrested when he came to pick up Ms. Griffini at headquarters. During the surrender of his property, he gave his keys to Det. Reynolds and told him Ms. Griffini would need them if he were arrested. Det. Reynolds gave Ms. Griffini the keys which she then returned him. She told the detectives they could search where ever they wanted.

Later that day, detectives searched the premises including a red utility trailer. The manufacturer's sticker was painted over and the VIN had been removed. The trailer was obviously repainted, most likely with a paintbrush. The detectives unlocked the latch on the trailer with one of defendant's keys. They seized the following:

- A rifle case containing a Sturm Ruger & Co. Model Mini 14, .223 caliber semi-automatic rifle;
- Four magazines for the Ruger .223 and approximately 30 rounds of ammunition;
- A black gym bag containing a sawed off shotgun with the serial number removed. It was a .16 gauge single shot shotgun with one live round. The gym bag also contained 7 boxes of ammunition, a baggie with ammunition cartridges, shotgun shells, a slapper, various documents from Best Shot Shooting Supply and the title to the gray '84 van;
- A pry bar.

First, Ms. Griffini's voluntary consent permitted the search of her premises and the gray van. The consent form does not limit the search and Ms. Griffini specifically said they could search where ever they wanted. She did not exclude the red trailer. The officers entered the trailer by using defendant's keys which defendant had directed be given to Ms. Griffini. She not only turned over defendant's keys to Det. Reynolds but gave instructions about how to manage the dogs and how to jiggle the keys. There is no question she had actual and apparent authority to consent to the search as more fully set out above. She also had defendant's Power of Attorney.

In addition, the trailer was stolen. Defendant does not have standing to challenge the search of the trailer because he has no expectation of privacy in stolen property. See footnote 9. A defendant has standing to challenge the admissibility of evidence only if his own constitutional rights have been violated. United States v. Padilla, 508 U.S. 77, 81 (1993); United States v. Salvucci, 448 U.S. 83, 86-87 (1980); Rakas v. Illinois, 439 U.S. 128, 134 (1978). In cases involving Fourth Amendment violations, courts determine standing by determining whether defendant had a reasonable expectation of privacy in the area searched or the items seized. The Supreme Court has adopted a two-part test to determine whether a person's expectation of privacy is legitimate: First, the person must exhibit an actual subjective expectation of privacy, and second, society must be prepared to recognize that expectation as objectively reasonable. Katz v. United States, 389 U.S. 347, 361 (1967).

First, the government proved the trailer was stolen. Michael Griffini testified defendant told him he took it from a construction site. Ms. Griffini testified how defendant would frequently steal things from construction sites. The trailer was re-painted by hand only three days after its arrival on the property. The VIN was removed and the manufacturer's sticker painted over. It was issued license REA589 and a DRX number for a "homemade" trailer. Mr. Wylde, a licensed inspector, testified that it was a manufactured trailer. Although in his self-serving testimony he denied he verified this trailer as homemade, clearly the DRX and license were issued for a trailer he certified as "homemade" and the license issued was on this trailer. There is no need to prove beyond a reasonable

doubt that the trailer was stolen; there was no evidence offered to contradict the government's proof and defendant proffered he was in lawful possession of the trailer.  See United States v. Tropiano, 50 F.3d 157, 161-62 (2nd Cir. 1995).

The government has listed factors relevant to determining standing:

whether the party has a possessory interest in the things seized or the place searched, whether the party can exclude others from that place, whether the party took precautions to maintain the privacy, and whether the party had a key to the premises.

United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999).

Although Ms. Griffini said everything was in her name, she also said defendant used the trailer.  Arguably, he had a possessory interest.  He had keys to the trailer ostensibly to exclude others but he gave the keys to Ms. Griffini when he was arrested thus giving up any  precautions to maintain his privacy.

Most significant, however, is the fact that when a defendant knowingly possesses stolen property he does not have a legitimate expectation of privacy in that property.  United States v. Tropiano, 50 F.3d 157, 161-162 (2nd Cir. 1995) (defendant who knowingly possesses stolen car has no legitimate expectation of privacy in the car);  United States v. Becantur, 24 F.3d 73, 76-77 (10th Cir. 1994) (to have standing to contest the search of a vehicle, defendant must prove that he was in lawful possession of the vehicle); United States v. Lanford, 838 F.2d 1351, 1353 (5th Cir. 1988) (the possessor of a stolen vehicle has no standing to object to its search); United States v. Hensel, 672 F.2d 578, 579 (6th Cir.) per curiam (same) cert. denied, 457 U.S. 1107 (1982); United States v. Hargrove, 647 F.2d 411, 413 (4th Cir. 1981) (same); see also United States v. Baker, 221 F.3d 438, 442 (3rd Cir. 2000); United States v. Yager, 2001 W.L. 34149272 (N.D.Iowa).  These cases support both prongs of the test:  a defendant has no expectation of privacy in stolen property and society is not prepared to recognize as objectively reasonable a defendant's expectation of privacy in stolen property.

United States v. Rowland, 341 F.3d 774 (8th Cir. 2003), the case cited by defendant for the proposition that the Eighth Circuit has rejected the conclusion that the police are free to search stolen

property, is not on point and does not stand for the proposition for which it is cited. In <u>Rowland</u>, the government did not challenge the defendant's standing. The lack of defendant's proof of ownership was merely offered as a reason for impounding the vehicle. The court found the inventory search pretextual because the officers did not comply with department policy for inventory searches.

In conclusion, there was no violation of the Fourth Amendment during the search on 1/16/03 and the items seized should not be suppressed.

iii.     1/20/03

On 1/20/03 Det. Reynolds responded to Ms. Griffini's residence on Bender Lane just as she was pulling into the driveway. He and the other detectives showed her the .223 rifle and sawed off shotgun they had seized and she affirmed they were the ones belonging to defendant. She had a file cabinet and gym bag which she had just retrieved from Jim Messenger's house. She voluntarily consented to a search, see above, and turned over the cabinet and bag to the detectives. The file cabinet contained nothing of evidentiary value. The gym bag contained various types of ammunition. She printed out and gave the detectives a copy of a contract she had prepared for defendant on her personal computer which defendant had used in connection with his roofing job in exchange for weapons. She also consented to searches of other portions of the property. She directed them to an unused bedroom where they were unable to locate the guns she said were taped under the drawers. She unlocked the trailer for the officers to take a second look but they located nothing of evidentiary value. While there, Ms. Griffini blurted out "the dishwasher." They responded to a storage room in the residence and located and seized a pistol next to the dishwasher. The gym bag and pistol were clearly seized pursuant to a voluntary consent as established above. There was no violation of the Fourth Amendment and these items should not be suppressed.

iv.     3/28/04

The officers returned one more time to search with a metal detector. Ms. Griffini voluntarily signed a consent to search form. Nothing was seized.

On 10/29/04 a second Evidentiary Hearing was held. The government presented the testimony of Lt. Chris Joggerst. Defendant did not present evidence. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law.

## A.    Findings of Fact[10]

**Lt. Chris Joggerst** is the general administrator of the Ste. Genevieve County Detention Center. He oversees the daily operation and is responsible for inmates, the employees, transportation and court duties. He detailed his experience and training at length. He noted Ste. Genevieve County has a contract with federal authorities to hold federal prisoners prior to trial. His primary concern and priority is the safety and security of inmates and staff.

When each inmate is received at the Ste. Genevieve County Jail, he is given an Inmate Handbook. Gov.Ex.40-M is a copy of part of the Handbook. Section 3.07 is the section that informs inmates of the cell search policy, § 3.04 states what is meant by contraband and § 3.05 deals with the handling of an inmate's personal property.

Section 3.07 states in pertinent part:

CELL SEARCHES
For the security of the facility and the safety of staff and inmates cell searches are routinely conducted throughout the facility. You will be advised to stand in the day room against the wall at an arms length apart until the deputy reaches your cell. You will be called to stand outside your cell during the cell search to observe the search.

---

[10]    The government proffered that during the course of the investigation and prosecution of another criminal case, information came to AUSA Roger Keller during a proffer that defendant, Dennis Hinkle, was planning to escape from the Ste. Genevieve County Jail. Mr. Keller made it known to the United States Marshals Service who informed Ste. Genevieve authorities. The government indicated that it would provide to counsel for defendant a summary of the proffer as it concerns defendant and will eventually provide Grand Jury testimony. At the time of the hearing, the Grand Jury testimony had not been provided for reasons of witness safety.

Defendant made no statements to law enforcement in relation to this count of the Indictment.

**If contraband is found it will be removed and a report will be forwarded to the shift supervisor for disciplinary action.**

From approximately 5/20/04 until the end of July, 2004 defendant was a federal prisoner housed at the Ste. Genevieve County Jail. He received a copy of the Inmate Handbook on arrival. On 7/26/04 defendant was to be transported to the federal courthouse for a motion hearing. Based on the information received from AUSA Keller, the Marshal's Service informed the Ste. Genevieve authorities that defendant may be a security risk and "may try to escape from transport." (see footnote 10). Therefore the Ste. Genevieve County Sheriff's Department provided a chase car to follow the transportation van.

On 7/27/04 Lt. Joggerst decided that for institutional safety purposes defendant's cell should be searched and defendant should be moved to another cell block. This decision is within his authority if there is a security risk. He consulted with other officials including Sgt. Wallace before making the decision.

Sgt. Wallace directed Deputy Weeden to remove defendant's property from his cell and move defendant to another cell block. The property was to be searched except for defendant's legal papers. It is standard practice to search property when a prisoner is moved.

Gov.Ex.41-M and 42-M are photographs which show the general layout of defendant's cell.

Gov.Ex.43-M is a photograph which shows the bars on the window of defendant's cell and shows that there had been an attempt to saw through the bars. Information that defendant tried to saw the bars came from another inmate.

Gov.Ex.44-M is an item found under defendant's mattress. It appears to be a bar with yarn wrapped around and with a large loop or noose at the end of the yarn. It is actually magazines rolled up tightly and wrapped with torn bed sheets made into a rope.

Gov.Ex.45-M is a photograph of items taken from defendant's cell from a box on the floor. It shows a box of cheese crackers which was on top of pieces of concrete hidden under a piece of plastic.

Gov.Ex.46-M is a photograph of a toothbrush with a sharpened edge which Lt. Joggerst suspected was some sort of inmate-made tool.

Gov.Ex.47-M is a hand drawn map showing the route from the jail to a location in Ste. Genevieve County off of Newman Road. This map was located in the laundry room in defendant Hinkle's property as the laundry worker was going through the linens. He found a tablet and this map was located between the last page of the tablet and the cardboard. The name and address of Bill Smelser appears on page three of the map. Lt. Joggerst had received information from Smelser that there was a map in defendant's property. Smelser was not an inmate when the property was seized. He was in the jail for a very short period of time.

## B.    Conclusions of Law

The Supreme Court has repeatedly held "that prisoners are not beyond the reach of the Constitution. No 'iron curtain' separates one from the other." Hudson v. Palmer, 468 U.S. 517, 523 (1984). "Prisoners must be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." Id. [11] However, imprisonment carries with it the circumscription or loss of many significant rights which is "justified by the considerations underlying our penal system. Id. quoting Price v. Johnson, 334 U.S. 266, 285 (1948). From the cases (see footnote 11) there emerges a rule that when a prison restriction infringes on a specific

---

[11]    For example, the Supreme Court has held that invidious racial discrimination is as intolerable within a prison as outside except as may be essential to "prison security and discipline." Hudson, 468 U.S. at 523 quoting Lee v. Washington, 390 U.S. 333 (1968) (per curiam). In addition, prisoners have the constitutional right to petition the government for redress of their grievances which includes a reasonable right of access to the courts. Johnson v. Avery, 393 U.S. 483 (1969). Prisoners must be provided reasonable opportunities "to exercise their religious freedom guaranteed under the First Amendment." Hudson, 468 U.S. at 523 citing Cruz v. Beto, 405 U.S. 319 (1972) (per curiam). Also, prisoners retain those First Amendment rights of speech, not inconsistent with [their] status as...prisoner[s] or with the legitimate penalogical objectives of the correction system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Prisoners enjoy the protection of due process. Wolf v. McDonnell, 418 U.S. 539, 555 (1974). The Eighth Amendment insures that prisoners will not be subjected to "cruel and unusual punishments." Estelle v. Gamble, 429 U.S. 97 (1976).

constitutional guarantee, it should be evaluated in light of institutional security. Security is the main objective of prison administration; ..." <u>United States v. Cohen</u>, 796 F.2d 20, 22 (2nd Cir. 1986).

The analysis turns on whether a prisoner's expectation of privacy in his prison cell is "justifiable" or "reasonable" and is the kind of expectation that society is prepared to recognize as reasonable. <u>Hudson</u>, 468 U.S. at 524. The Supreme Court held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." <u>Hudson</u>, 468 U.S. at 526. The same rule applies to pretrial detainees. <u>Bell v. Wolfish</u>, 441 U.S. 520, 546 (1979) (the fact of confinement and the legitimate objectives of the penal institution curtail the constitutional rights of any prisoner, whether convicted or not). The Eighth Circuit has consistently upheld these principals. <u>See</u> <u>Foster v. Helling</u>, 210 F.3d 378 (2000) (unpublished opinion holding prisoners have no legitimate expectation of privacy in prison cell); <u>Olson v. Klecker</u>, 642 F.2d 115, 116 (8th Cir. 1981) (search of prisoner's cell, even when prisoner was not present when cell was searched, was constitutional under <u>Bell v. Wolfish</u>).

Applying these principles to the present case, it is clear that the search of defendant's cell did not violate the Fourth Amendment. Prisoners at the Ste. Genevieve County Jail are alerted to the policy of cell searches on arrival by furnishing them with the Inmate Handbook. There is a further policy that property is searched if a prisoner is to be moved to a different cell. Here, the officials had information that defendant was a security risk and might attempt to escape. <u>Hudson</u> can be read to hold that prison officials are presumed to do their best to evaluate and monitor objectively the security needs of the institution and inmates in their custody, and then to determine whether and when such concerns necessitate a search of a prison cell. <u>Cohen</u>, 796 F.2d at 23. The Ste. Genevieve officials decided to move defendant to a different cell and search his cell for legitimate reasons of security. <u>Id.</u> at 22, 23. The questions that can be raised about the sawing of the bars and the location of some of the property in the laundry room go to the weight, not the admissibility of the evidence.

The search of defendant's cell and the seizure of defendant's property do not in any way violate the Fourth Amendment. These items should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements be **DENIED**[12]. [Doc. 18]

**IT IS FURTHER RECOMMENDED** that Defendant's Post-Hearing Motion to Suppress Evidence be **DENIED**. [Doc. 41]

**The Honorable Jean C. Hamilton has scheduled trial in this case on <u>Monday, February 14, 2005</u> at <u>9:00 A.M.</u>**

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this __20th____ day of December, 2004.

---

[12] The undersigned offers no opinion about defendant's statements at police headquarters on 1/13, 1/14 and 1/15 because insufficient evidence was offered at the Evidentiary Hearing and defendant made no challenge to his statements in his post-hearing brief. Defendant's statements at the murder scene on 1/13 should not be suppressed. He made no statements on 1/16.